IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| LAURA JOHNSON-PRICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:07cv568-MHT |
| | ) | (WO) |
| ALABAMA DEPARTMENT OF | ) | |
| HUMAN RESOURCES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

Plaintiff Laura (Clemons) Johnson-Price, an African-American, brings federal employment discrimination claims against the following defendants: the Alabama Department of Human Resources (DHR), DHR Commissioner Nancy Buckner, the Alabama State Personnel Department (SPD), and SPD Director Jackie Graham.  Johnson-Price charges that DHR and Buckner engaged in race discrimination and retaliation in respect to hiring and the terms and conditions of her employment, while SPD and Graham perpetuated race discrimination in the allocation of promotions.  She asserts each of these claims pursuant to

42 U.S.C. § 1981 (by and through 42 U.S.C. § 1983) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981a, 2000e to 2000e-17.   This court has original jurisdiction over the Title VII claims under 42 U.S.C. § 2000e-5(f)(3) and the § 1981 claims pursuant to 28 U.S.C. § 1343.

The defendants now move for summary judgment on all claims.   For the reasons that follow, the defendants' motions will be granted in part and denied in part.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c)(2).   Under Rule 56, the court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.

2

Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986).

## II. BACKGROUND

Johnson-Price was employed by DHR for over 25 years. After graduating from the University of Alabama in 1978 with a Masters of Social Work degree, she was hired by the DHR office in Calhoun County as a Social Worker III. In 1983, she was promoted to Welfare Supervisor II, and in 1993, after the state DHR reclassified the agency's job categories, she was named Service Supervisor II, followed by a promotion to Senior Social Worker that same year.  In August 1993, she was named Human Resources Program Specialist, a position with the state DHR.

### A.  Pickens County Director

Johnson-Price submitted an application for the Pickens County Director position in 1993.  The

applications were reviewed by the Pickens County Board.[1] Among the list of applicants, Johnson and Tony Black, a white man, were similarly ranked.  However, the Board ultimately chose Black for the position.

### B.  Calhoun County Assistant Director

Also in 1993, the position of Assistant Director in Calhoun County became vacant, and, between September 1993 and January 1994, Johnson-Price wrote letters expressing her interest in the job to several members of the DHR leadership, including the DHR Commissioner, Calhoun County Director Erin Snowden, and the Director of DHR's Civil Rights/Equal Employment (CR/EE) Office, Sylvester Smith.  A state-wide budget freeze was in effect at that time, which purportedly delayed the hiring process.

---

1.  DHR county boards are comprised of non-DHR employees who are citizens of the relevant county, each of whom is appointed by the county commission, and who serve as autonomous entities from the state DHR.  The county boards are the hiring authorities for the county directors.

In January 1994, in the midst of the budget freeze, Director Snowden was offered the opportunity to hire either a Financial Support Supervisor or an Assistant Director; Snowden chose to hire a Financial Support Supervisor. In April 1994, Johnson-Price again informed Snowden and Smith, as well as Waldo Spencer, Director of DHR's Personnel Division, that she wished to be considered for the Assistant Director position. Soon after, the DHR Staffing Committee exempted the position from the hiring freeze.

In August 1994, Mike Galloway, a DHR Regional Manager, instructed Snowden to post and distribute an announcement for the Assistant Director opening. Johnson-Price was one of two applicants for the job, along with Mike Norton, a white male. Norton eventually withdrew his application, and, on January 7, 1995, Johnson-Price was provisionally appointed as the Assistant Director for Calhoun County. Her position became permanent in May 1995.

After her promotion to Assistant Director, Johnson-Price had severe disagreements with Snowden, who served as her immediate supervisor.  Snowden harassed Johnson-Price and engaged in repeated efforts to  undermine her authority.  Several of these instances, summarized in Johnson-Price's brief opposing summary judgment, are outlined below.

Stress Management Training:  In May 1995, Johnson-Price sent a memo to Snowden and the Calhoun County DHR supervisors about a county-wide Stress Management Workshop, planned for August 1995.  Bobby Malone, who was both the DHR County Board Chairman and the Director of Family and Children Services at the Calhoun County Mental Health Center, agreed to conduct the workshop.  In June 1995, Malone informed Snowden and Johnson-Price that he would not charge a personal fee to conduct the workshop, but would only collect $ 250 from Calhoun County for materials.  Johnson-Price sent a letter to Snowden,

confirming that Malone would not receive DHR funds for his personal benefit.

On July 21, 1995, Snowden sent a memo to the county supervisors informing them that it was against DHR policy to use local funds to support staff training. Johnson-Price contends that the memo implied that she was attempting to illicitly spend the office's money.[2] Snowden consequently refused to pay for the training. On August 25, 1995, Regional Manager Galloway informed Snowden that he supported the training and after addressing Snowden's various funding concerns, the event went forward as planned.

Tile Removal: On September 7, 1995, Snowden berated Johnson-Price in front of other Calhoun County employees for authorizing the removal of tiles in the staff

---

2. DHR and Buckner assert that Snowden opposed the training because it presented an "ethical issue" to hold "a DHR event in which a Calhoun County DHR Board member stood to make a profit." DHR Defs.' Br. at 8 (doc. no. 46). Johnson-Price states that Snowden's ethical claim is "bogus" as "[n]one of the money [from the training] would go to Malone personally." Pl.'s Br. at 5 and n. 5 (doc. no. 61).

breakroom without Snowden's approval. Snowden claimed that the tiles contained asbestos and thus constituted a health hazard to the employees in the building. Johnson-Price presented evidence that "the tile was not asbestos and therefore presented no problem for removal and disposal." Pl.'s Ex. 23 (doc. no. 66-6). As a result of Snowden's actions, Calhoun County Supervisor June Ledbetter wrote a letter to Malone on September 8, 1995, complaining of the "verbal beating" that Snowden inflicted upon Johnson-Price. Pl.'s Ex. 21 (doc. no. 66-4).[3] Johnson-Price also sent a memo to Snowden, objecting to the director's decision to take unfounded and inappropriate disciplinary action in the presence of Johnson-Price's subordinates.

<u>Internal Protocol and Procedures</u>: Throughout the year, Snowden repeatedly held meetings without informing Johnson-Price. In the meetings Johnson-Price did attend,

---

3. In her letter, Ledbetter also stated that Snowden repeatedly attempted "to undermine and discredit" Johnson-Price, and engaged in "blatant attack[s] on her credibility as a manager." Pl.'s Ex. 21 (doc. no. 66-4).

Snowden would often request detailed reports, to be completed on very short notice, or would falsely accuse Johnson-Price of failing to submit reports in a timely fashion.   Furthermore, when Johnson-Price purchased furniture, supplies, equipment, or other "enhancement items" for the office, Pl.'s Br. at 9 (doc. no. 61), Snowden would object to her purchases--though they had been discussed and approved beforehand--and refuse to pay the bills in a timely fashion.

Allocation of Supervisory Duties:   On January 11, 1996, Snowden distributed a memorandum to Calhoun County staff, informing them that she was taking a medical leave of absence and assigning supervisory duties in her absence.   As Assistant Director of Calhoun County, Johnson-Price was second in command to Snowden; nevertheless, upon her leave, Snowden left Johnson-Price's subordinates in charge of many office functions. For instance, Supervisor Kay Tolbert was put in charge of one of the two Calhoun County offices, and granted

9

oversight of the agency's service delivery programs, financial transactions, and personnel matters.[4]   In contrast, Johnson-Price was left in charge of one agency office, and instructed to oversee leave processing, financial support programs, and emergency procedures. Pl.'s Ex. 25 (doc. no. 66-8).   When Snowden was again absent in June 1996, Supervisors Tolbert and Price were charged with operating one of the Calhoun County offices, while Johnson-Price was instructed to supervise the other.   Johnson-Price submits that Snowden's delegation practices were inconsistent with Calhoun County procedure.[5]

   <u>Annual Performance Evaluation</u>:   In December 1995, Snowden conducted Johnson-Price's annual job-performance

---

   4. The record indicates that Calhoun County operated two DHR offices, a building at 801 Noble Street, and another office at 1200 Noble Street Building.

   5. After Snowden's retirement in 1996, Johnson-Price served as Assistant Director to Tony Black, who succeeded Snowden as Calhoun County Director.   Johnson-Price notes that when Black took a leave of absence, she was left to oversee all office programs and administration.

evaluation and rated her as "Partially Meets Standards."
Pl.'s Ex. 30 (doc. no. 66-13).   In the evaluation,
Snowden set forth several examples of Johnson-Price's
allegedly poor performance.[6]  Johnson-Price did not agree
with Snowden's review and refused to sign the form.   As
a result of Snowden's rating, Johnson-Price was not
eligible for a merit-based pay raise.

Under DHR policy, Snowden was expected to supply
Johnson-Price with a "pre-appraisal" assessment at the
beginning of the year, listing the relevant standards of
evaluation for her position.   Pl.'s Br. at 9-10.[7]

---

6. In her review, Snowden declared that, on numerous
occasions, Johnson-Price failed to notify her of planned
trainings and workshops (including the Stress Management
Workshop, described above), submitted requests for
additional staff or equipment that were beyond the
ability of the director to deliver, which created
"friction, disillusionment, and negatively impact[ed]
morale," fomented "health and safety risk[s]" on DHR
premises (referring to the asbestos tile incident), and
repeatedly violated the National Association of Social
Workers Code of Ethics.  Pl.'s Ex. 30 at 3-4 (doc. no.
66-13).

7. DHR's Personnel Manual states:  "The purpose of
the pre-appraisal session is to enable the supervisor and
(continued...)

However, Snowden did not distribute the pre-appraisal report until immediately before the actual evaluation. After receiving the negative performance review, Johnson-Price filed a complaint with the CR/EE Office, charging Snowden with failing to provide task statements and performance standards over the course of the year and alleging that Snowden's evaluation was "unfair" and "being used as a form of retaliation." Pl.'s Ex. 36 (doc. no. 67-2).[8] In response, Personnel Director Spencer notified Snowden that Johnson-Price had filed a complaint, and reprimanded Snowden for her failure to provide Johnson-Price with performance standards prior to her evaluation.[9]   In January 1996, Galloway conducted a

---

7. (...continued)
worker to discuss written statement[s] concerning the employee's job tasks and the performance standards to be used in monitoring these tasks."  Pl.'s Ex. 29 at 6 (doc. no. 66-12).

8. In the CR/EE complaint, Johnson-Price alleged race discrimination and retaliation based on many of the same facts set forth in her brief opposing summary judgment.

9. In his memorandum to Snowden, Spencer referred to (continued...)

second performance rating to replace Snowden's evaluation, at which time Johnson-Price received "a perfect rating" and a merit-based pay raise. King Decl. (doc. no. 47-6).

In October 1996, in response to Johnson-Price's internal complaint, CR/EE Director Smith issued an investigative report, which concluded that Snowden had retaliated against Johnson-Price in violation of §§ 703(a)(1) and (2) and § 704(a) of Title VII.[10] Smith

---

9. (...continued)
DHR's Departmental Personnel Manual (which states that "[e]mployees shall not be given an Unsatisfactory Rating unless action has been taken on the part of the supervisor to bring the infraction to the attention of the employee") and found that Snowden had failed to engage in this process prior to the evaluation. Spencer also informed Snowden that she had inappropriately based her evaluation on the National Association of Social Workers Code of Ethics, by failing to advise Johnson-Price that she would be evaluated based on those criteria. Pl.'s Ex. 37 (doc. no. 67-3).

10. In the investigative report, Smith determined that Snowden retaliated against Johnson-Price in the following ways: "1) coercive questioning, 2) retaliatory work assignments, 3) discriminatory job performance evaluation, 4) retaliatory (verbal) reprimands, 5) threats to take adverse employment action based on (continued...)

13

recommended that the performance evaluation conducted by Snowden be permanently removed from Johnson-Price's employment file and that DHR take reasonable steps to "remedy the [effects] of the discriminatory retaliatory treatment directed against Laura Johnson-Price." Pl.'s Ex. 45 at 4 (doc. no. 67-11). Snowden retired as County Director effective September 1, 1996, one month before the CR/EE Office issued its report.

In June 1994, Johnson-Price filed a charge with the Equal Employment Opportunity Commission (EEOC),[11] alleging that she had been the victim of racial discrimination and retaliation with respect to the terms and conditions of

_____

10. (...continued)
manufacturing a cause, 6) failing to provide to the complainant a non-hostile working environment, and 7) retaliatory usurping of the complainant's job authority." Pl.'s Ex. 45 at 3 (doc. no. 67-11).

11. Johnson-Price first filed an EEOC charge against DHR in 1990, but the charge was resolved and its factual allegations are not at issue in this litigation. In November 2003, she filed a third EEOC charge against DHR, alleging race discrimination and retaliation, after she was removed by the Calhoun County Board as County Director and transferred to a position with the state DHR office in the Quality Control Unit.

14

her employment with DHR.[12]   In August 2004, she amended
the charge, claiming that DHR employed a discriminatory
selection system, which affected the agency's entrance
requirements and examinations, job classifications, and
the criteria and procedures used to formulate job
'registers'[13] and 'Certificates of Eligibles.'[14] Pl.'s Am.
EEOC Charge (doc. no. 47-12).

On November 23, 1998, Johnson-Price sought to
intervene in the case of <u>Crum et al v. State of Alabama,</u>

_____

12. The charge specifically stated that DHR's
systemic discrimination affected her opportunities in
hiring, promotions, compensation benefits, selection
ratings, training, discipline, and job assignments.
Johnson-Price also alleged that, "In the absence of such
racial discrimination in hiring and promotions, I and
other blacks would have had a great opportunity of
supervising and being supervised by persons of my same
race."  Pl.'s EEOC Charge (doc. no. 47-11).

13. Applicants for DHR positions may be placed on the
register for a specific position only after filing a
valid application and satisfying the position's entrance
requirements, as set forth in the job announcements
published by the DHR Personnel Department.

14. A 'Certificate of Eligibles' constitutes a list
of eligible applicants, adopted from the register, and
ranked by examination score and personal service rating.

consolidated as <u>In re Employment Discrimination Litigation Against the State of Alabama</u>, CV 945-356-N. On June 1, 2007, this court granted her motion to intervene, and this case was subsequently converted into a separate lawsuit.

## III. DISCUSSION

As a preliminary matter, Johnson-Price improperly asserted violations of 42 U.S.C. §§ 1981 and 1983 against instruments of the Alabama government. Agencies of the state are immune from such suits under the Eleventh Amendment, regardless of the relief requested. <u>See</u> <u>Cory v. White</u>, 457 U.S. 85, 90-91 (1982) (citing <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974)); <u>see</u> <u>also</u> <u>Carr v. City of Florence</u>, 916 F.2d 1521, 1525 (11th Cir. 1990) (noting that Alabama has not waived its Eleventh Amendment immunity). As to DHR and SPD, Johnson-Price admits they are immune from suit under § 1981, as enacted through § 1983. She also concedes that, as Buckner and Graham

16

are sued in their official capacities, they are immune from suit for monetary damages and are unnecessary parties to the Title VII claims. Johnson-Price may legally maintain suit for injunctive relief against these officials. See Taylor v. Alabama, 95 F. Supp. 2d 1297, 1310 (M.D. Ala. 2000) (DeMent, J.) (citing Ex Parte Young, 209 U.S. 123 (1908)).

In opposing the defendants' motions for summary judgment, Johnson-Price also concedes to the dismissal of the majority of her claims.[15]  As a result, only six claims remain.  She has four claims of race discrimination as to (1) the selection of the Pickens County Director in 1993; (2) the hiring delay for the Calhoun County Assistant Director position in 1994; (3) her mistreatment as the Calhoun County Assistant

---

15. Johnson-Price does not contest summary judgment for her failure to hire claims as to the Calhoun County Director position in 1997, Regional Manager position, Pickens and Blount County Director positions, or the St. Clair County Director position.  She also concedes to the dismissal of her claim alleging discriminatory delay in hiring for the Calhoun County Director position in 1998.

17

Director; and (4) the allocation of promotions within DHR.     She also maintains two retaliation claims pertaining to (5) the hiring delay and (6) her treatment as Assistant Director.   Each claim is governed by Title VII and § 1981, by and through § 1983.

Finally, before reaching the merits in this case, the court addresses the defendants' defense that Johnson-Price's claims are precluded on the grounds of res judicata.   Res judicata bars the re-litigation of claims that "arise[] out of the same nucleus of operative fact," In re Piper Aircraft Corp., 244 F.3d 1289, 1297 (11th Cir. 2001), and which were raised or could have been raised in the prior litigation.[16]   See Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1187 (11th Cir. 2003). Johnson-Price previously brought actions in state court

_____

16. In order to bar a subsequent action, the moving party must show: "(1) the prior decision was rendered by a court of competent jurisdiction; (2) there was a final judgment on the merits; (3) the parties were identical in both suits; and (4) the prior and present causes of action are the same." Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1187 (11th Cir. 2003) (internal citations omitted).

(<u>Johnson-Price v. Fuller et al.</u>, CV-2003-3236) and federal court (<u>Clemons v. Alabama Department of Human Resources et al.</u>, CV-04-2939), alleging discrimination and retaliation based on her removal from the Calhoun County Director position in 2002. Judgment was entered for the defendants in both suits.[17]

However, res judicata does not apply to the remaining claims in this case. Johnson-Price filed the state and federal suits over five years after moving to intervene in the <u>Crum</u> litigation. In the later cases, she did not raise claims related to her tenure as Assistant Director for Calhoun County or her application for the Pickens County Director position, as litigation on those issues was already pending before this court. Instead, her suit concerned facts that arose after her intervention in <u>Crum</u>. See <u>In re Piper Aircraft Corp.</u>, 244 F.3d 1289, 1298 (11th Cir. 2001) (internal citations omitted)

---

17. In the state suit, the court dismissed the action following a bench trial. Summary judgment was granted in the federal case.

19

(Claims are not precluded where "the facts giving rise to the second case only arise after the original pleading is filed in the earlier litigation."). Therefore, as the instant claims have not been previously litigated and as Johnson-Price had no opportunity to raise them in a prior action, they are not precluded by res judicata.

Having addressed the necessary preliminary issues in this case, the court moves to a discussion of the merits.


### A. Race Discrimination

Johnson-Price brings four claims of race discrimination pertaining to her employment with DHR. She asserts that DHR and Buckner engaged in racial discrimination (1) as to the selection process for the Pickens County Director position in 1993; (2) in delaying the hiring process for the Calhoun County Assistant Director position in 1994; and (3) in her mistreatment as Assistant Director after she was hired. She also alleges

(4) that SPD and Graham engaged in racial discrimination as to the allocation of promotions.

Johnson-Price first asserts a 'failure-to-hire' claim for the position of Pickens County Director. She alleges that the Pickens County Board of Directors discriminated against her in selecting Tony Black, a white man, for the position of County Director, though both she and Black were of commensurate rank, based on DHR hiring criteria.

The court presumes that Johnson-Price has established a prima-facie case of race discrimination under both Title VII and § 1981.[18]  See Walker v. Prudential Property and Cas. Ins. Co., 286 F.3d 1270, 1274-75 (11th Cir. 2002) (To establish a prima-facie case of failure to hire, the plaintiff must show "that she is a member of a protected class, that she applied for and was qualified

_____

18. See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and 42 U.S.C. § 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").

for an available position, that she was rejected, and that the defendant filled the position with a person outside the protected class."). However, DHR provided evidence that the Pickens County Board chose Black as director based on the fact that one of the board members knew Black personally, had worked with him in the past and, as a result, internally promoted Black's application. Cowart Decl. (doc. no. 76-2). Johnson-Price is unable to rebut this "legitimate, nondiscriminatory reason for the employee's rejection," Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981), and offers no evidence that the board's stated reasons for hiring Black were "a pretext for discrimination." Id. (setting forth the burden-shifting framework for Title VII claims established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

Johnson-Price also asserts race discrimination in Calhoun County's delay in hiring her for the Assistant Director position. She alleges that, in January 1994,

22

when Snowden was granted a reprieve from the hiring
freeze and permitted to employ either a Financial
Services Superior or an Assistant Director, she purposely
chose to fill the former position so as not to hire
Johnson-Price.    Johnson-Price contends that Snowden
"delayed filling [the Assistant Director] position to
retaliate and discriminate" against her.   Pl.'s Br. at
41.

        Johnson-Price's claim cannot be analyzed under the
"failure to hire" framework, as she was, in fact, hired
for the Assistant Director position in January 1995.
Instead, the court examines whether DHR's delay in hiring
Johnson-Price constitutes an adverse action, so as to
establish, absent direct evidence, a prima-facie case of
disparate treatment.   See Wilson v. B/E/ Aerospace, Inc.,
376 F.3d 1079, 1087 (11th Cir. 2004) (in order to
establish a prima-facie case of disparate treatment under
both Title VII and § 1981, the plaintiff must show that
she was "a qualified member of a protected class and was

subjected to an adverse employment action in contrast with similarly situated employees outside the protected class"). There is nothing in the record to indicate that the hiring delay constituted an "adverse employment action." At the time Johnson-Price applied for the Assistant Director position, she was employed as a Human Resources Program Specialist with the state DHR. She offers no evidence that, as a result of the delay, she suffered a loss in compensation or other employment benefits. In fact, she provides no evidence of any alteration in the conditions of her employment during the 12 months the position remained vacant. See Davis v. Town of Lake Park, Fla, 245 F.3d 1232, 1239 (11th Cir. 2001) ("[T]o prove adverse action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment.") (emphasis in original). Johnson-Price instead expects the court to find a genuine issue of fact as to the discrimination claim based on Snowden's alleged "propensity to ... discriminate," from

which a reasonable fact-finder could infer "that she delayed filing the position to ... discriminate against [Johnson-Price]."  This wholly tautological argument fails to satisfy Johnson-Price's burden at this stage in the litigation.

Johnson-Price also claims race discrimination based on her treatment as Calhoun County Assistant Director, while under the supervision of Director Snowden.  She states that Snowden repeatedly undermined her authority before subordinates, chastised her in a demeaning and disrespectful manner, delegated duties so that she was constructively "demoted," Pl.'s Br. at 14, and issued an unfounded annual performance evaluation.  Johnson-Price's claim fails, however, as she is again unable to establish a prima-facie case of discrimination.

Even assuming a jury could find that the above-named acts constitute adverse-employment action, Johnson-Price does not show that a similarly situated member of an unprotected class was treated more favorably during the relevant time period.  In order to show that employees

25

are similarly situated, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different way." Silvera v. Orange County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) (internal quotations omitted). This is generally demonstrated by the use of a "comparator," a human measuring stick of racial discrimination, who must be "nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Wilson, 376 F.3d at 1091.

Johnson-Price does not provide such a comparator. She merely concludes that "Snowden did not treat her with respect and that was different treatment than the white employees received." Pl.'s Br. at 42. As evidence, she points to a letter from Calhoun County Supervisor Ledbetter, which stated that Snowden inflicted a "verbal beating" upon Johnson-Price in the presence of subordinate employees. Pl.'s Ex. 21 (doc. no. 66-4). However, Ledbetter does not maintain that Snowden acted

in a discriminatory fashion; in fact, in this same letter, Ledbetter, a white woman, also complained that Snowden severely rebuked her before other supervisors. The record suggests that Snowden maintained antagonistic relationships with several of her employees, both white and black, and there is no evidence of racial favoritism in this regard.

Johnson-Price does attempt to conduct a direct employee comparison by alleging that she was treated less favorably in the pre-appraisal process than white employees. Specifically, she states that Snowden conducted only a "very general" pre-appraisal prior to her annual performance evaluation, while "detailed preappraisals [were] done in other counties on white employees." Pl.'s Br. at 11. As evidence, Johnson-Price underlines the reports conducted on behalf of two white employees, both of whom worked in other counties.

In order to constitute "similarly situated" employees, the individuals to be compared must have "(1) dealt with the same supervisor, (2) been subject to the

27

same standards, and (3) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Sanguinetti v. United Parcel Service, Inc., 114 F. Supp. 2d 1313, 1317 (S.D. Fla. 2000) (Ryskamp, J.); see also Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) (noting that "disciplinary measures undertaken by different supervisors  may not be comparable for purposes of Title VII analysis").  The pre-appraisal reports at issue here were conducted by different supervisors, who evaluated employees working in different offices, performing different job responsibilities.  Johnson-Price and the white employees were not similarly situated, and thus, their pre-appraisal reports cannot be utilized as evidence of discrimination.

In sum, Johnson-Price has provided no evidence that ties her treatment, albeit perhaps unfair, to race, such as that a supervisor treated a similarly situated white person differently from the way she was treated or that

there was otherwise an environment of discrimination against black persons in the place where she worked. Without any basis for comparison, no reasonable fact-finder could conclude that Snowden's actions were performed with racial bias.  Summary judgment will be granted on Johnson-Price's claim of race discrimination in the Assistant Director position.

Finally, in her initial complaint, Johnson-Price charged SPD and Graham with race discrimination in the allocation of promotions, in violation of Title VII and § 1981.  However, in her brief opposing summary judgment, Johnson-Price does not address either SPD or Graham, and she fails to undertake any arguments relating to the allocation and distribution of promotions.  Consequently, there are no remaining issues of material fact as to the SPD defendants.

Summary judgment will be granted on each of Johnson-Price's claims of race discrimination.

29

## B. Retaliation

Johnson-Price brings two claims of retaliation. First, she asserts that DHR, acting through Snowden, retaliated against her by delaying her appointment to the position of Assistant Director of Calhoun County. Second, she contends that Snowden subjected her to retaliatory treatment after she accepted the position of Assistant Director in 1995. In order to establish a prima-facie case of retaliation, Johnson-Price may show that "(1) she engaged in an activity protected under Title VII; (2) she suffered [a materially adverse] action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).

In addressing the matter of causality, encapsulated in the third prong of the Crawford test, Johnson-Price relies principally upon a chronology drafted by Regional Manager Galloway as "evidence that Snowden did not want to promote [Johnson-Price] because of her prior EEO activity." Pl.'s Br. at 35. In this chronology,

Galloway summarizes the hiring process for the Calhoun County Assistant Director position and notes that Snowden "was critical of [Johnson-Price's] history of filing EEO complaints" and did "not want to offer [Johnson-Price] the position."  Pl.'s Ex. 6 (doc. no. 64-7).  Galloway's statement, if reliable and believable, is clear evidence that Snowden knew of Johnson-Price's protected activity; however, it also constitutes an unofficial memorandum, and there is no evidence that it was kept in the regular course of business.   As such, the chronology is inadmissible hearsay and may not be considered in a motion for summary judgment.   See E.E.O.C. v. Alton Packaging Corp., 901 F.2d 920, 926 (11th Cir. 1990) ("Under Fed. R. Evid. 803(6), business records are admissible if (1) they were made at or near the time the recorded events occurred; (2) they were made by, or from information transmitted by, a person with knowledge of the recorded events; (3) it was the regular business practice of the organization to keep such records; (4) the record was kept in the course of a regularly

31

conducted business activity; and (5) all of the above is shown by the testimony of the evidence custodian or other qualified witness."); see also Macuba v. DeBoer, 193 F.3d 1316, 1323 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment.") (internal citations omitted).

Johnson-Price has submitted a motion pursuant to Fed. R. Civ. P. 56(f), requesting the opportunity to conduct additional discovery by deposing Regional Manager Galloway, so that he can "provide testimony that Snowden was critical of [Johnson-Price's] history of filing EEO complaints."  Pl.'s Mot. at 2 (doc. no. 98).  As Galloway's testimony may establish a genuine issue of fact as to Johnson-Price's retaliation claims, the court granted her motion to the limited extent of allowing the deposition of Galloway.  Therefore, the court pretermits addressing the merits of Johnson-Price's retaliation claims until the evidentiary record is complete.

***

32

For the foregoing reasons, the defendants' motions for summary judgment are granted as to the defense of Eleventh Amendment immunity and unnecessary parties and as to Johnson-Price's race discrimination claims; the motions are denied as to Johnson-Price's retaliation claims, with leave for DHR and Buckner (the only defendants on the retaliation claims) to renew the motions as to these claims within 35 days from today's date, so as to give Johnson-Price an opportunity to depose Galloway.  If DHR and Buckner fail to renew the motions as to the retaliations claims within this time-frame, these claims will be set for trial.  An appropriate order will be entered.

DONE, this the 30th day of March, 2010.


     /s/ Myron H. Thompson     
UNITED STATES DISTRICT JUDGE